In re MOTEL INVESTMENT
GROUP, INC., Debtor.

MOTEL INVESTMENT GROUP,
INC., Plaintiff,

v.

Michael WU, Defendant.

Bankruptcy Nos. 93 B 04960, 93 A 00595.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Feb. 23, 1994.

Michael J. Davis, Flynn, Cosentino, Ltd., Lisle, IL, for plaintiff.

Thomas Jaros, Smith, Williams & Lodge, Chicago, IL.

Arnold Landis, Chicago, IL, for defendant.

J. Joseph Little, Hamblet, Casey, Oremus & Valin, Chicago, IL.

William Hunter, Chicago, IL.

Edward Bradley, Chicago, IL.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

ERWIN I. KATZ, Bankruptcy Judge.

Motel Investment Group, Inc. ("Debtor") is a corporation formed to acquire a motel property (the "Motel"). The Motel was owned and operated by Michael Wu ("Wu"). Wu, together with John Huang, William Lin and Judy Chen, formed the corporate debtor as a vehicle to transfer the property to the new group who would then finance its rehabilitation and conversion into a Best Western Inn. After Debtor acquired the Motel through an oral installment contract (the "Agreement"), and renovations were completed, a dispute arose between Wu and the other shareholders. Debtor fell into arrears on payments due under the Agreement. Wu filed suit against Debtor in state court seeking Debtor's ouster under the Illinois Forcible Entry and Detainer Act (735 ILCS §§ 5/9–101—321 (1993)). A Default Judgment and Order of Possession was entered in Wu's favor. Debtor succeeded in having the default judgment vacated and obtained leave to answer or otherwise plead. However, rather than wage the battle for possession in state court, Debtor chose to file its bankruptcy petition. It then filed this Complaint for Turnover of the Motel under 11 U.S.C. § 542. Wu objects to the turnover and seeks, by counterclaim, a judicial determination that the Agreement is null and void, and that Debtor has forfeited all its rights thereunder, including any right to recover payments made thereunder, and its interest in the Motel. After considering the evidence and arguments presented, the Court finds that Debtor may be entitled to turnover of the Motel if it can demonstrate that Wu's interest will be adequately protected. Because the Court finds that the Agreement does not include an express forfeiture provision, the prayer in Wu's counterclaim for forfeiture of Debtor's rights and interests under the Agreement is denied. The Court applied a preponderance of the evidence standard to this trial.[1] No final order will be

---

1. Some cases have held that in Section 542 hearings the burden of proof should be by "clear and convincing evidence." *See In re Hill*, 156 B.R. 998, 1006 (Bankr.N.D.Ill.1993); *In re Robertson*, 115 B.R. 613, 620 (Bankr.N.D.Ill.1990); *In re Bloom*, 91 B.R. 445 (Bankr.N.D.Ohio 1988); *In re De Berry*, 59 B.R. 891, 896 (Bankr.E.D.N.Y. 1986) (citing *Oriel v. Russell*, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929)). In this case it

entered pending the conclusion of the adequate protection hearing.

The Court's jurisdiction to hear this matter derives from 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. It is a core matter under 28 U.S.C. § 157(b)(2)(A) and (E).

## FACTS

### Introduction

Many of the material facts are not in dispute. The parties entered into the Agreement in early September, 1990, wherein Wu was to convey the Motel to Debtor for a purchase price of $1.2 million. The purchase price included the assumption of a $280,000 mortgage (the "Benyon Mortgage") and $920,000 to be paid to Wu. While Debtor did not formally assume the Benyon Mortgage, it was responsible for paying the monthly installments of $4,000 and, in addition, real estate taxes and insurance premiums after September, 1990. The parties disagree as to whether the Agreement included a $300,000 downpayment to Wu, when the installments due to Wu were to commence, and when title was to pass.

Debtor concedes that it defaulted under the Agreement. As of mid-November, 1992, it had failed to make at least three payments on the Benyon Mortgage, and had not paid an aggregate of $63,605.98 in real estate taxes for 1991 and 1992, or $5,785.00 in insurance premiums. Wu advanced these payments in Debtor's stead to protect the property and was not reimbursed. In November, 1992, Wu served Debtor with a Notice to Declare Forfeiture, listing the admitted defaults as well as the failure to pay 27 installments of $6,335.03 each that Wu claimed were due to him. The claimed defaults were not cured within the allotted 30 days, and Wu thereupon served Debtor with a Declaration of Forfeiture and instituted forcible entry proceedings in the Circuit Court of Cook County to retake possession of the Motel. He won a default judgment and order of possession and evicted Debtor. He has remained in possession ever since, notwithstanding that Debtor was successful in having the default judgment vacated.

### Chronology

Throughout the events related herein, Wu has been the record owner of the Motel—a two-story, 53-unit building, built in the early 1960's. Prior to his association with Debtor, Wu owned the Motel individually, and operated it as a Royal 8 Motel. He bought the Motel in 1980 from Alfred Benyon for $850,000, making a $250,000 downpayment and giving Benyon a purchase money second mortgage for $420,000. NBD Skokie Bank held the first mortgage in the amount of $180,000. Wu operated the Motel from 1980 to 1990 with the help of his wife, family and a few employees. Prior to his dealings with Debtor, he never missed a payment on either mortgage in ten years.

In 1989, Wu received an offer to purchase the Motel for $1.23 million. William Lin, Wu's accountant since 1975, reviewed the books with the potential buyer's accountant. The sale wasn't completed because the buyer found another property. Wu estimates that his equity in the Motel in mid-1990 was approximately $800,000, based on the amount offered in 1989 less the balance on the two mortgages. In mid-1990, he owed $143,000 on the NBD mortgage and $280,000 on the Benyon mortgage.

In late spring of 1990, Wu entertained the idea of converting the Motel to a Best Western Inn, wanting to take advantage of its international reservation network. Wu told his idea to John Huang, whom he had known for ten years, and who Wu was aware had recently bought the Best Western in LaGrange, Illinois. When Huang heard Wu's plan, he offered to buy shares in the Motel and to assist him in obtaining the franchise. He told Wu that he had considered buying the Motel himself ten years earlier. The two had several conversations along these lines, and in early July, Huang introduced Wu to Judy Chen, one of his employees, who was also interested. Shortly thereafter, Lin joined the discussions.

 Huang, Chen, Lin and Wu met twice in August, 1990—on the 16th and the

matters not, since the result is the same under either standard.

22nd—to discuss the terms of the proposed venture. At the suggestion of Lin, who, as a CPA and director of New Asia Bank, was apparently the most commercially sophisticated and respected member of the group, they agreed to form a corporation which would acquire ownership and renovate the Motel so it could be operated as a Best Western Inn franchise. Debtor was formed in September, 1990, whereupon the parties entered into an oral purchase agreement.[2] The original investors were Lin, Huang, Judy Chen, Dr. Samuel Chen, and Wu. They each invested $100,000 in Debtor in August or September in return for a 20% interest.[3] Dr. Chen subsequently changed his mind, and Wu bought out his interest, paying him $30,000 in April, 1991 and $70,000 in May, 1991. Thereafter, Wu had a 40% interest and Lin, Huang and Judy Chen each retained a 20% interest. The Debtor's four shareholders also became its directors and officers. Huang became the president, Wu the vice president, Chen the secretary and Lin the treasurer.[4] Lin received the monthly bank statements and prepared all of Debtor's tax returns and financial statements.

Debtor agreed to buy the Motel for $1.2 million, with a $300,000 downpayment and the remaining $900,000 to be paid in monthly installments. The installments, amounting to approximately $10,000 per month, would include $4,000 per month on the balance of the Benyon Mortgage, and monthly payments of $6,335 to Wu on his balance of $620,000. The NBD mortgage was paid in full as part of Wu's downpayment.[5] The corporation was responsible for real estate taxes and insurance premiums. There was contradictory testimony regarding when title was to pass to the Debtor under the Agreement. The Court finds, based on the parties' understanding of the nature of installment contracts for real estate, the unreliability of Debtor's witnesses, and the circumstances related herein, that the Agreement provided that title would pass after Wu had been paid in full.

Of the $500,000 invested by the individuals, $300,000 was deemed paid to Wu as a downpayment as follows: The first mortgage to NBD in the amount of $143,428.75 was paid in full; half of Wu's investment was credited in the amount of $100,000; $32,000 was paid in real estate taxes for the first eight months of 1990 when Debtor was not in possession; and $24,525.37 was paid to Wu in cash.

The Court finds that, unlike most land installment contracts, the Agreement did not include a forfeiture provision. The only evidence adduced to establish such a provision was testimony by Wu and Lin regarding the parties' understanding that if Debtor did not make all its payments under

2. At trial, Debtor attempted unsuccessfully to establish a written memorandum through the use of purported corporate minutes. No other documents were introduced to evidence a written agreement. The Illinois Statute of Frauds has been waived, however, since both parties acknowledge the existence and subject matter of the Agreement. See R.J.N. Corp. v. Connelly Food Products, Inc., 175 Ill.App.3d 655, 663, 125 Ill.Dec. 108, 113, 529 N.E.2d 1184, 1189 (1988) (it is well established that the Statute of Frauds may be waived by an acknowledgement of the agreement and the subject matter thereof); McCollum v. Bennett, 98 Ill.App.3d 80, 82, 53 Ill.Dec. 677, 679, 424 N.E.2d 90, 92 (1981) (same). In addition, where an agreement is manifest from the performance of the parties, the Statute of Frauds will not bar its enforcement. Monetti, S.P.A. v. Anchor Hocking Corp., 931 F.2d 1178, 1183 (7th Cir.1991); Payne v. Mill Race Inn, 152 Ill.App.3d 269, 277–78, 105 Ill.Dec. 324, 330–31, 504 N.E.2d 193, 199–200 (1987). Here, the parties' actions throughout the subject time period indicates an understanding on both sides that an agreement was in place.

3. There was contradictory testimony on behalf of Debtor regarding the characterization of the initial investments. The Court finds that the entire amounts were invested in exchange for shares of the corporation and that no portions thereof constituted loans.

4. Although it is unclear when, at some point during the events related herein Wu replaced Lin as treasurer.

5. Debtor alleged that the payment to NBD was unauthorized, and claimed that it ceased meeting its obligations under the Agreement in 1992 when it purportedly first discovered that the payment had been made. Debtor has introduced no evidence to substantiate either that the payment was unauthorized or that Debtor failed to discover the payment until mid–1992. Wu's testimony that the payment was intended as part of Debtor's $300,000 downpayment to him comports with the evidence in its entirety.

the Agreement it could lose the Motel. In view of the strictness with which Illinois courts construe forfeiture provisions[6] and the fundamental principle that "equity abhors a forfeiture,"[7] the fact that no written evidence was adduced to substantiate such a provision, and the weakness of the testimony on this point, the Court finds there is insufficient evidence to support the existence of a forfeiture provision.

On September 1, 1990, the Motel closed for renovations. Huang and Wu were to oversee the renovations. Because Wu lived five blocks from the Motel, and Huang lived in Milwaukee, Wisconsin, Wu would make payments from Debtor's checking account as they arose, and Huang would travel to Chicago once a week and initial the check stubs, as Debtor's president, to approve the payments. On August 27, 1990, Debtor entered into an agreement with Grand Hospitality Management, Inc. to manage the renovations. While the agreement estimated a budget of approximately $480,000, the shareholders realized that additional funds would be required.

On November 14, 1990, Wu obtained a $50,000 short-term unsecured construction loan from New Asia Bank ("NAB") to pay the general contractor. The loan was approved by the shareholders and wired to Debtor's account. On November 17, 1990, to replace the short-term loan and obtain additional funds to begin renovations, Wu borrowed $300,000 from NAB on a personal note secured by a mortgage on his residence. Lin submitted the required corporate documentation for the loan. After $50,000 was used to pay off the short-term construction loan, the remaining $250,000 was transferred to Debtor's bank account.

The cost of renovations totaled $680,000. Wu obtained two additional short-term construction loans of $50,000 each, on January 25, 1991, and February 12, 1991. On February 27, 1991, Debtor borrowed an additional $300,000 from NAB on a note secured by a mortgage on the Motel. Wu signed this note both individually, as title holder, and in his capacity as vice president and treasurer of Debtor. Huang, Chen and Lin's wife signed as guarantors. The proceeds of the second loan were used first to pay off the two $50,000 short-term construction loans, and the remainder was wired to Debtor's corporate accounts.[8] Interest payments on both $300,000 loans were claimed as deductions on Debtor's 1990 and 1991 tax returns, and were made by automatic withdrawals from Debtor's corporate account. Huang stopped the automatic payments in June, 1992, and, at the time of trial, the second loan was in default, with a balance of $275,000. In June, 1993, NAB filed a lawsuit against Wu individually and against Chen and Huang as guarantors.

The Motel opened as a Best Western on March 20, 1991. Business was bad from the start, worrying the investors. Only four or five rooms were rented per night. Huang and Chen managed the Motel until mid-May, when Shell Hospitality Group, Inc. ("Shell") took over. Shell managed the Motel through May, 1992 when its contract expired. After the contract with Shell expired, Lin, Chen and Huang, constituting a majority of the shareholders, changed the locks on the Motel to keep Wu off the premises, and modified

---

6. See In re Layton, 138 B.R. 219, 222 (Bankr. N.D.Ill.1992); Hettermann v. Weingart, 120 Ill. App.3d 683, 688–89, 76 Ill.Dec. 216, 220, 458 N.E.2d 616, 620 (1983); Bocchetta v. McCourt, 115 Ill.App.3d 297, 300, 71 Ill.Dec. 219, 221, 450 N.E.2d 907, 909 (1983); Tobin v. Alexander, 63 Ill.App.3d 397, 400, 20 Ill.Dec. 368, 370–71, 380 N.E.2d 45, 47–48 (1978); Kelly v. Germania Sav. & Loan Ass'n, 28 Ill.2d 591, 594, 192 N.E.2d 813, 816 (1963). Kingsley v. Roeder, 2 Ill.2d 131, 137, 117 N.E.2d 82, 85 (1954).

7. Aden v. Ahvardt, 76 Ill.App.3d 54, 59, 31 Ill. Dec. 514, 517, 394 N.E.2d 716, 719 (1979); Rose v. Dolejs, 1 Ill.2d 280, 289–290, 116 N.E.2d 402, 409 (1953).

8. As in the case of Wu's payment of the NBD mortgage, Debtor alleges without substantiation that Wu's repayments of the three $50,000 short-term construction loans from the proceeds of the two $300,000 secured loans were unauthorized, and that its discovery in mid–1992 of these payments prompted it to cease meeting its obligations under the Agreement. Again, Debtor's allegations conflict with the evidence in its entirety, while Wu's testimony that the payments were authorized is consistent with the larger picture.

the authorization on the bank accounts to exclude Wu.

In 1990, Debtor paid the real estate taxes and insurance premiums. In 1991, it paid the first installment of real estate taxes, but failed to pay the second. Wu paid $24,317.80 in real estate taxes for Debtor in 1991. In 1992, Wu paid both installments of real estate taxes, in the amount of $39,288.18, and $5,785.00 in insurance premiums. As of November, 1992, Debtor had failed to make the following payments: 27 monthly installments to Wu of $6,335.03 each, totaling $171,045.81; five monthly installments of $4,000 on the Benyon Mortgage, totaling $20,000; $63,-605.98 in real estate taxes for 1991 and 1992; and $5,785.00 in insurance premiums.

On November 11, 1992, Wu served Debtor with a Notice of Intent to Declare Forfeiture, setting forth the amounts in default, totaling $260,436.79, and indicating Wu's intention to evict Debtor from the Motel under either the Forcible Entry and Detainer Act or the Illinois Mortgage Foreclosure Act if the defaults were not cured within 30 days. Debtor made no payments to Wu during the next · 30 days, and on December 14, 1992, Wu served a Declaration of Forfeiture on Debtor. The Declaration declared that Debtor had forfeited all of its rights, and all payments it had made to Wu, under the Agreement, and demanded immediate possession of the Motel. On December 14, 1992, Wu filed a Verified Complaint For Possession in the Circuit Court of Cook County. The Declaration of Forfeiture was recorded with the Cook County Recorder of Deeds on December 16, 1992. On January 14, 1993, the Circuit Court entered a Default Judgment and Order of Possession, and Wu took possession. Debtor filed a motion on February 5, 1993 to vacate the default judgment, and on March 2, 1993, the circuit court vacated the default judgment and granted Debtor leave to answer or otherwise plead. Rather than file an answer or seek to retake possession in the state court proceeding, Debtor filed its Chapter 11 petition on March 8, 1993.

Wu has remained in possession during the pendency of these proceedings. When he reentered the Motel in January, 1993, the Best Western international reservation network and water had been shut off, and the telephone, cable and garbage companies had threatened to disrupt services because payments were in arrears. Wu borrowed $13,-000 to bring the payments current and reestablished the services necessary to the operation of the Motel. The Motel continues to operate as a Best Western franchise under Wu.

After filing the petition in this Court, Debtor filed a Motion for Turnover. Wu objected, asserting that a proceeding for turnover under 11 U.S.C. § 542 can only be brought as an adversary proceeding under Fed.R.Bankr.P. 7001. An order was entered denying the motion without prejudice, and the *status quo* was maintained by agreement of the parties.

### DISCUSSION

*Debtor's Breach*

■ Having observed the demeanor of the witnesses, and viewing the testimony and other evidence in its entirety, the Court finds that Debtor's defaults under the Agreement constitute an unexcused material breach thereof. Debtor alleged both in its Response to Wu's Request to Admit Facts and at trial that it ceased meeting its obligations under the Agreement because it discovered, after being in possession of the Motel and its records for a year and a half, that Wu had not transferred title to the Motel and that he had made unauthorized withdrawals from Debtor's checking account. At trial, Debtor adduced the testimony of two of its principals, John Huang and William Lin. The Court finds the testimony of Huang and Lin unreliable and Debtor's explanations implausible. To the contrary, the weight of the evidence supports Wu's testimony that (1) the parties agreed that title would pass upon payment in full of the purchase price, and (2) Wu's use of corporate funds was authorized.

Debtor has failed to introduce any evidence to support its allegation that Wu misappropriated corporate funds. The payments that it attempted to show were unauthorized have all been accounted for in the facts related herein. The payments include amounts credited towards the downpayment and the amounts taken from the two $300,000

NAB loans to pay off the three short-term construction loans. The shareholders approved all of these payments at the time they were made. Huang, Debtor's president, initialed the check stubs of all payments made from the corporate accounts. Lin, a CPA, a director of NAB, and accountant for both Debtor and Wu individually, reviewed all of Debtor's monthly bank statements. He prepared all Debtor's financial statements and tax returns, and prepared Wu's tax returns. He was fully aware of Debtor's and Wu's financial transactions. If Wu's use of corporate funds had been amiss, it would not have taken until May of 1992 for the other shareholders to find out. Given the close scrutiny by Huang and Lin of payments from corporate funds, and that the allegedly unauthorized payments have been accounted for, the Court finds implausible Debtor's allegation that Wu misused corporate funds.

It is equally implausible that the transfer of title was a condition precedent to Debtor's performance under the Agreement. No one testified that the parties intended that Wu was to receive a purchase money mortgage. Moreover, if the immediate transfer of title had been part of the Agreement, Debtor's principals would have insisted that Wu transfer such title prior to proceeding under the Agreement.

The version of events presented by Huang and Lin is inconsistent with the expectations of reasonable businessmen, especially in light of their expertise and participation in Debtor's activities and financial concerns. In ad-

dition, their testimony attempting to establish the terms of the Agreement appears fabricated. Debtor attempted to introduce, through the testimony of Huang and Lin, typewritten documents that were purportedly the official minutes of the corporate directors' meetings wherein the parties agreed to the terms of the Agreement. After cross examination, however, Debtor took the position that the typewritten pages were a transcription from handwritten corporate notes. Debtor represented to the Court that Judy Chen would authenticate the typewritten documents. When Chen failed to testify, it became apparent that the documents were prepared in anticipation of the present litigation to support Debtor's theory of the case. Debtor's attempt to introduce documents that were prepared specifically for use at trial as business records damages its credibility with respect to the remainder of its testimony. Moreover, it has failed to introduce evidence to account for its failure to meet its obligations under the Agreement. Wu, therefore, may pursue the remedies available to an installment contract seller, subject to Debtor's rights under the Bankruptcy Code.

*Wu's Possession*

■ Debtor argues that Wu's possession is wrongful because he proceeded under the Illinois Forcible Entry and Detainer Act (735 ILCS 5/9-101—321 (1993)) [9] rather than the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1101—1706 (1993)) [10] when he ejected Debtor. Regardless of whether the

9. 735 ILCS 5/9-102 provides in pertinent part: (a) The person entitled to the possession of lands or tenements may be restored thereto under any of the following circumstances:

(5) When a vendee having obtained possession under a written or verbal agreement to purchase lands or tenements, and having failed to comply with the agreement, withholds possession thereof, after demand in writing by the person entitled to such possession; provided, however, that any such agreement entered into on or after July 1, 1987 where the purchase price is to be paid in installments over a period in excess of 5 years and the amount unpaid under the terms of the contract at the time of the filing of a foreclosure complaint under Article XV, including principal and due and unpaid interest, is less than 80% of the original purchase price shall be foreclosed under the Illinois Mortgage Foreclosure Law.

10. 735 ILCS 5/15-1106 provides in pertinent part: (a) ... [T]he following shall be foreclosed in a foreclosure pursuant to this Article:

(2) any real estate installment contract *for residential real estate* ... under which (i) the purchase price is to be paid in installments over a period in excess of five years and (ii) the amount unpaid under the terms of the contract at the time of the filing of the foreclosure complaint, including principal and due and unpaid interest, at the rate prior to default, is less than 80% of the original purchase price of the real estate as stated in the contract. (emphasis added)

(c) ... A contract seller *may at its election* enforce in a foreclosure under this Article any real estate installment contract entered into on or after the effective date of this Amendatory Act of 1986 and not required to be foreclosed under this Article. (emphasis added)

facts in this case gave rise to an action under the Forcible Entry and Detainer Act, Wu entered the Motel under court order. After Debtor had the Default Judgment and Order of Possession vacated, while Wu was still in possession, it was free to pursue its available remedies, if it had any, to oust him. Had Debtor proceeded before the state court it would have lost. Debtor was, and is, in breach of the Agreement. It could not, therefore, maintain a possessory right superior to Wu's. During the pendency of the bankruptcy proceedings and the present adversary action Wu has remained in possession by agreement of the parties, thereby maintaining the *status quo* until a determination could be made on the merits of the cause. Having heard the merits, the Court finds, by virtue of Debtor's default under the Agreement and its failure, at least thus far, in the present action to demonstrate adequate protection of Wu's interest, that Wu's possessory interest is superior to that of Debtor. The Court therefore finds that Wu took possession under proper authority, and has remained in rightful possession during the pendency of this litigation.

### Equitable Conversion

 Notwithstanding its material default, at the time of the filing of the bankruptcy petition, Debtor had a sufficient equitable interest for the Motel to be considered property of the estate under 11 U.S.C. § 541, subject to Wu's rights under the Bankruptcy Code. Whether Debtor had an interest in the Motel as of the commencement of the bankruptcy case is a question of state law. *Butner v. U.S.*, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979) ("[D]etermination of property rights in assets of a bankrupt's estate left to state law."); *In re Atchison*, 925 F.2d 209, 210 (7th Cir.1991). As previously discussed, since there was no forfeiture provision in the Agreement, and since the default order of possession was vacated prior to the filing of the petition in bankruptcy,

Debtor had an interest in the Motel, either as contract purchaser or as owner. In *Shay v. Penrose*, 25 Ill.2d 447, 449, 185 N.E.2d 218, 219–20 (1962) the Illinois Supreme Court recognized that under Illinois law, under certain conditions, the doctrine of equitable conversion confers equitable ownership upon the buyer upon entering into an installment contract for real property. *See also In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989) (Seventh Circuit applied the doctrine of equitable conversion to hold that an installment contract for real property is not an executory contract under the Bankruptcy Code); *Rosewood Corp. v. Fisher*, 46 Ill.2d 249, 257, 263 N.E.2d 833, 838 (1970).[11] While in material default of the Agreement at the time it filed for bankruptcy, Debtor retained an interest in the Motel, and is thus entitled to cure the default and reinstate the Agreement in its attempt to reorganize. *See* 11 U.S.C. §§ 1123(a)(5)(G) and 1124(2); *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (debtor retained an interest in property seized by IRS prior to filing of Chapter 11 petition); *Matter of Madison Hotel Associates*, 749 F.2d 410, 419 (7th Cir.1984) (Chapter 11 debtor's plan of reorganization may cure default of an accelerated loan). Wu's remedies,[12] therefore, arising from Debtor's material breach, may be held in abeyance while the rights of the parties are examined in accordance with the Bankruptcy Code.

### Termination of Debtor's Interest

 Wu argues that he terminated Debtor's interest prepetition. Notwithstanding the recognition in Illinois that an equitable interest may, in an appropriate case, pass to the buyer upon entry into the installment contract, such interest may be terminated. Courts have consistently held that a buyer's interest in an installment contract may be terminated in accordance with express forfeiture provisions included therein. *See In re Layton*, 138 B.R. 219, 222 (Bankr.N.D.Ill.

---

11. For the purposes of this opinion, the Court need not consider the extent of the *Shay v. Penrose* holding or whether *Streets & Beard* is limited to its direct holding.

12. Under common law, Wu may elect to rescind or, in the alternative, enforce the contract and seek damages. *Hepperly v. Bosch*, 172 Ill.App.3d 1017, 1022, 123 Ill.Dec. 70, 73, 527 N.E.2d 533, 536 (1988); *Herrington v. McCoy*, 105 Ill.App.3d 527, 61 Ill.Dec. 130, 434 N.E.2d 67 (1982).

1992); *In re Jones*, 99 B.R. 877 (Bankr. N.D.Ill.1989); *Bocchetta v. McCourt*, 115 Ill. App.3d 297, 299–300, 71 Ill.Dec. 219, 221, 450 N.E.2d 907, 909 (1983); *Brown v. Jurczak*, 397 Ill. 532, 540, 74 N.E.2d 821, 825 (1947); *see also Illinois Fair Plan Ass'n v. Astirs, Inc.*, 89 Ill.App.3d 422, 425, 44 Ill.Dec. 684, 687, 411 N.E.2d 1050, 1053 (1980) (equitable conversion unavailing to purchaser after contract forfeited); *Hartman v. Hartman*, 11 Ill.App.3d 524, 528, 297 N.E.2d 199, 202 (1973) (same). However, Illinois does not allow forfeiture of an installment contract in the absence of an express contractual provision. *Hettermann v. Weingart*, 120 Ill. App.3d 683, 688–89, 76 Ill.Dec. 216, 220, 458 N.E.2d 616, 620 (1983); *Lovins v. Kelley*, 19 Ill.2d 25, 28, 166 N.E.2d 69, 71 (1960); *see also Dahm, Inc. v. Jarnagin*, 133 Ill.App.3d 14, 15, 88 Ill.Dec. 326, 328, 478 N.E.2d 641, 643 (1985) ("Although forfeitures are not favored, courts will enforce forfeiture provisions where the right is clearly shown and injustice will not result"); *Bocchetta*, 115 Ill. App.3d at 299–300, 71 Ill.Dec. at 221, 450 N.E.2d at 909 (in the event of buyer's default, seller must strictly follow the remedies set forth in the contract).[13] Because the Agreement does not contain a forfeiture provision, Wu's Declaration of Forfeiture was ineffective in terminating Debtor's interest prepetition. Having established that both Wu and Debtor have interests in the Motel, upon the filing of the bankruptcy petition their respective rights are somewhat altered under the Bankruptcy Code.

*Turnover*

■■■■ Before the Court may grant an order for turnover under § 542(a) of the Bankruptcy Code,[14] Debtor must show (1) an interest in the property it seeks, and (2) upon request from an entity with an interest in such property, adequate protection of such entity's interest during the pendency of the bankruptcy proceedings.[15] *See Hill*, 156 B.R. at 1006. Debtor acquired an interest in the Motel that was not terminated pre-petition. Wu's interest is also manifest. He is the record owner, retaining a secured interest until payment in full under the Agreement. Therefore, Debtor is entitled to turnover of the Motel, subject to a demonstration that Wu's interest is adequately protected.

■■■■ Neither party has addressed the issue of adequate protection, upon which the Court's decision must rest. Wu has not demanded it, relying on his argument that Debtor's interest was terminated prepetition. Debtor has not offered it. Wu carries the initial burden to demand that his interest be adequately protected. *See Whiting Pools*, 462 U.S. at 204, 103 S.Ct. at 2313 ("At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the

---

**13.** This principle is distinguishable from case law that holds that a contract buyer may forfeit its downpayment or earnest money when the seller is ready and able to conclude the agreement. The latter principle arises from the recognition that a buyer who pays a deposit or earnest money receives value in the nature of an option. *See Linster v. Regan*, 108 Ill.App.2d 459, 248 N.E.2d 751 (1969) (buyer forfeited deposit on purchase of restaurant even if forfeiture clause found to be invalid); *Glenn v. Price*, 337 Ill.App. 637, 86 N.E.2d 542 (1949) (defaulting purchaser forfeits its downpayment when the vendor is ready and able to comply with the terms of the contract); *First Nat'l Bank of Barrington v. Oldenburg*, 101 Ill.App.3d 283, 56 Ill.Dec. 766, 427 N.E.2d 1312 (1981) (where buyers defaulted on land contract, vendors allowed to retain earnest money without showing of actual damages suffered on account of buyers' default); *Pruett v. La Salceda, Inc.*, 45 Ill.App.3d 243, 3 Ill.Dec. 917, 359 N.E.2d 776 (1977) (vendor of realty entitled to retain earnest money upon buyers' anticipatory repudiation of contract despite absence of contractual provision authorizing such retention).

**14.** 11 U.S.C. § 542(a) (1993) provides in pertinent part: [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

**15.** 11 U.S.C. § 363(e) (1993) provides: Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

creditor."); *In re World Communications, Inc.,* 72 B.R. 498, 502 (D.Utah 1987) (timely request by secured party required for entitlement to adequate protection); *In re Alpa Corp.,* 11 B.R. 281, 289 (Bankr.D.Utah 1981) (burden on entity having interest in property to request demonstration of adequate protection); *cf. In re Aegean Fare, Inc.,* 33 B.R. 745, 748–49 (Bankr.D.Mass.1983) (where perishable nature of debtor's food inventory necessitated immediate action on its turnover complaint, bankruptcy court raised the question of adequate protection *sua sponte,* treating the secured creditor's objection to turnover as a request for adequate protection). Wu has not made a specific demand for assurance of adequate protection. His actions, however, go much further. He has retaken possession of the Motel and seeks to terminate all Debtor's interests therein. Such action may be considered as an election to rescind the Agreement and a demand for adequate protection.

### CONCLUSION

The Court therefore finds that (a) Debtor Motel Investment Group, Inc. has breached its agreement with Wu, (b) Wu has no right to forfeit the Agreement, and (c) Wu is entitled to his common law remedies for breach of the Agreement. Debtor shall serve its offer of adequate protection on Wu by March 28, 1994, and a hearing on the sufficiency of adequate protection shall be held on April 20, 1994, at 2:00 p.m. together with the hearing on the Amended Disclosure Statement and Plan of Reorganization.